**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| | : | |
| AIR SEA INTERNATIONAL | : | |
| FORWARDING, INC., | : | Civil Action No.  03-cv-268 (PGS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| GLOBAL IMPORTS and TRADING, INC., | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

---

SHERIDAN, U.S.D.J.

Air Sea seeks to collect monies owed from David Tank, a principal of St. Croix Imports, based upon his personal guarantee[1] for shipping costs and services associated with importing 47-60 tons of wool rugs from New Delhi, India.  This case involves busy entrepreneurs of small businesses doing what they do best – hustling to earn a living. The project failed for numerous reasons.  The matter was tried without a jury on June 16 and 17, 2008[2].  There were only two witnesses, Ray Tobia and David Tank.

### I.

Air Sea International Forwarding, Inc. ("Air Sea") is a New Jersey corporation with its

---

[1]    As explained in the text, Lingaraj Mishra is also sued.  He is a principal of both Global and SCI.  He settled for an undisclosed amount.

[2]    There are numerous references to the transcript.  The transcript of June 16, 2008 is referred to as 1T, and the transcript of June 17, 2008 is referred to as 2T.

principal place of business located in Old Bridge, New Jersey.  Air Sea carries on business as an international freight forwarder.  Ray Tobia is the president of Air Sea.  Tobia has been working in the international freight forwarding business since 1983 and with Air Sea since its formation in 1997. As Tobia described, Air Sea is a travel agent for goods.

Global Imports and Trading, Inc. ("Global") was a Minnesota corporation supposedly engaged in the business of the import and sale of rugs from India, with its principal place of business located in Eden Prairie, Minnesota.  Lingaraj Mishra was president of Global.  Mishra's partner was Mike Abri.  Global and Mishra allegedly had experience and connections with manufacturers of woolen rugs in India.

David Tank is a manufacturer's representative who has a long-term relationship with the purchasing department at Target Corp.  He was also a pilot in the United States Air Force Reserves for 22 years, retiring with the rank of Major in 2006. In the fall of 2002 through May 2003, David Tank was deployed on active duty in Iraq and Afghanistan for more than 140 days.

Sometime in the spring of 2002, Mishra and Abri met with David Tank with the idea of creating a new joint venture to import rugs from India and sell them to Target, utilizing Mishra and Global's importing experience and David Tank's connections with Target.  David Tank, Gerald Tank and Scott Tank agreed to enter into the joint venture with Mishra and Abri.

The joint venture was initially formed as St. Croix Imports, Inc. ("SCI"),[3] a Minnesota corporation, on July 15, 2002 for the sole purpose of importing rugs and selling them to Target for

---

[3]      SCI was initially incorporated as a corporation rather than a limited liability company.  Thereafter, St. Croix Imports and Trading, LLC ("SCIT")  was formed on February 20, 2003, as a successor to SCI for the purpose of importing rugs and selling them to Target. SCIT is owned in equal shares by A & L and the Tank Group.  Since all the germane facts occurred prior to the formation of SCIT, all references herein will be to SCI.

profit.  SCI's registered office and principal place of business were the same as Global's offices. SCI was owned in equal shares by A & L, LLC ("A&L") and the Tank Group, LLC ("Tank Group"). A & L is a Minnesota limited liability company formed at that time for the sole purpose of holding a 50% ownership interest in SCI. A&L is owned by Mishra and Abri.  The Tank Group is also a Minnesota Limited Liability company formed in 2002 for the same purpose of holding a 50% ownership interest in SCI, and is owned in equal shares by David Tank, Gerald Tank and Scott Tank.

SCI's operation was financed by the Tank Group from the outset.  (2T 37:7-22, 40:17-41:1). A series of promissary notes evidences the capital invested by the Tank Group between July and December 2002.  (D-2)[4].  They are:

| Date | Amount |
|------|--------|
| July 31, 2002 | $33,152.43 |
| August 31, 2002 | $21,075.00 |
| September 30, 2002 | $30, 446.00 |
| October 1, 2002 | $71,776.64 |
| November 30, 2002 | $42,611.54 |
| December 31, 2002 | $    361.96 |
| | |
| Total | $199,423.57 |

The two hands-on principals of SCI were David Tank and Lingaraj Mishra.  David Tank's primary role in SCI was to sell rugs to Target and to manage that relationship, while Mishra's was to arrange purchase and shipment of the rugs from India to Target in Minneapolis.  Due to David Tank's efforts, Target recognized SCI as a new vendor and assigned SCI the vendor ID number I-11 in early September 2002.

---

[4]      References to trial exhibits are denoted as "P" for Plaintiff's exhibits and "D" for Defendants' exhibits.

At that time, Target ordered 60 tons of wool rugs from SCI at a price of approximately $126,000.00[5]. Delivery was due by September 17, 2002.  It made little sense for SCI to accept these terms because SCI was unprepared to perform.  It had to locate, ship and deliver rugs from India within approximately two weeks.  At the time, SCI was under-capitalized and did not have a relationship with any freight forwarder who knew how to import rugs from India in such a short time frame.  Moreover, Tank knew Target required timely delivery, and if a delay occurred, any future business with Target was questionable. As Tank put it, "either the manufacturers ship on time or you can pretty much not going [sic] to be in business with Target in the future."  (2T 31:16-17)[6].

Somehow Mishra, on behalf of SCI, located 47-60 tons of wool rugs in New Delhi within several days of the Order and evidently came to terms on price.  Solving this problem, SCI's next formidable task was to arrange pickup of the rugs in New Delhi, India and delivery to Minneapolis, Minnesota within about ten days.

Although it is not entirely clear how it came about, David Tank contacted Tobia of Air Sea to act as a freight forwarder for SCI. After this initial contact between Tank and Tobia, it appears that Tobia mainly discussed shipping issues with Mishra.  Tobia, on behalf of Air Sea, agreed to provide services and provided a cost quotation for his services.  (P-2).

---

[5]      According to Mishra and Tank, only 47 tons of carpet were actually delivered to Target.

[6]      Tank testified that Target utilizes "just in time" inventory methodology which requires prompt delivery (2T 31:15-25).  He recalled that after the first shipment of rugs was due, "one of the VPs of Target walked through" a store and complained to a buyer about the empty shelves where the rugs were to be displayed. (*Id.* 32:2-4).

4

In an e-mail dated September 11, 2002 (P-3) from Tobia to Amil Bhagat of KLM Air Cargo, Tobia confirmed that he quoted SCI that 47,000 kilograms[7] of rugs could be shipped from New Delhi to Minneapolis at a rate of $2.912 per kilogram or $136,864.00[8].  At trial, neither of the two witnesses confirmed the exact weight of the rugs shipped and received. Tank testified that Tobia estimated that the shipping costs were to be approximately $100,000 for 47 tons of rugs. Mishra, at his deposition, testified the cost was to be in the neighborhood of $150,000 for up to 60 tons of rugs. Tobia testified that the order was for 47 tons (1T 77:1-5), but Air Sea's quotation was for 47,000 *kilograms*.  (P-3).  Putting aside the weight issue for now, SCI had other predicaments to overcome.

SCI had two other major hurdles. The issues were how to pay for the rugs and shipping costs, and how to quickly obtain governmental approval and registration to act as an importer in order to import the rugs within Target's deadline.  As it turns out, SCI had no financing beyond Tank's infusion of capital and no credit history since it was a start-up operation. In addition, it was not registered to act as an importer.  Evidently, Target extended the initial delivery date because SCI scrambled to work out these critical issues despite the fact that the original delivery date passed. With regard to the registration issue, SCI overcame this problem by allowing Global to act on its behalf in order to expedite this transaction. On September 20, 2002, Mishra executed a document entitled "customs power of attorney" on behalf of Global bearing registration number 41-2000019 to facilitate shipment. (P-6).  On September 25, 2005, Tank acknowledged this accommodation by

---

[7]     1 kilogram equals 2.2 pounds.

[8]     This price was higher than originally anticipated by SCI.  Initially, Mishra believed the cost would be $2.28 per kilogram. (P-2).

executing a letter. (P-5)[9].  It states:

> This is to certify that Global Imports and Trading will be the importer of record for the shipment of woven jute wool rugs on bill of lading no. 020 2393 2156.

In order to resolve the payment of shipping costs, Air Sea agreed to finance the shipment costs so long as a credit agreement was executed and personal guaranties were signed. As Tobia testified, there is an e-mail from Tobia to Mishra dated September 24, 2002 (P-24) which sets forth the terms of the credit arrangement. It reads:

> Further to our conversation, attached please find the credit application which we need you to complete.  As discussed, we will have to use our line of credit loan to pay this, and we will extend 15 days credit maximum on any freight, duty, tax, etc.

> Our bank is going to charge us prime interest 4.75% plus 2.99% from the day we tap the line, which will be today, September 24, 2002.  I will begin to issue invoices to you dated today, so the first payment from you will be due on or before October 9, 2002. As I do not know the amounts we will be laying out as yet, you will be receiving multiple invoices from us for freight, then clearance and delivery.

> Also as discussed, I will need the attached credit application completed, signed and sent back to me, together with letters of personal guarantee of the funds from each of the directors, owners, principals of your company, stating the persons full name, home address, home telephone numbers, social security number, etc.

> In addition, we will also require you to list each persons capacity with the company.

---

[9]    The letter is on St. Croix Trading and Collectibles letterhead and signed by Tank, as secretary of St. Croix Collectibles, Inc. The problem with the letter is that neither of these entities was involved in the rug transaction. The Court finds that the use of the wrong letterhead and corporate position were merely mistakes by Tank. His intent was to bind SCI. As noted earlier, these were busy business persons who were not concerned about the particulars.

Should you have any questions or require any further information, please do not hesitate to contact me.

Please note that since this is the first time we are doing business together, and because of the sum of money we will have to lay out, I will not tap our line of credit loan until I have everything back from you as mentioned above.

Upon receipt of this memorandum, Mishra gathered these documents in order to complete the rug transaction. More specifically, Mishra executed the credit agreement of Air Sea to finance the transaction on behalf of Global, and he signed a personal guarantee and had Tank sign a similar one in order to secure payment to Air Sea.

The credit agreement is dated September 25, 2002 ((P-8) hereinafter referred to as "Credit Agreement) and is on Air Sea letterhead. Since SCI was a start-up company, and not creditworthy. Accordingly, Air Sea required three credit references, which SCI could not provide. As a result, Global, an ongoing concern, entered into the Credit Agreement with Air Sea. The Credit Agreement is signed by Mishra as president of Global. It enumerates three credit references and contains three provisions. The body of the agreement reads:

Upon acceptance of this application, the undersigned agrees to the following terms and to pay any interest and costs of collection as set forth:

1]      TERMS OF PAYMENT.  Invoices are due upon presentation and payment shall be considered late [past due] if not received within ten [10] days from the billing date.

2]      INTEREST ON LATE PAYMENTS: Interest is due at the current maximum, legally allowed rate in the applicable state.

3]      COST OF COLLECTION: In the event that collection efforts are required in order to effect any outstanding balance due, it is agreed that in addition to the principal then outstanding the account [as shown above] shall pay all costs of collection including, but not

7

limited to, collection/attorney fees of 35% which shall be added to the principal amount due.

On the same day as the Credit Agreement was executed, Tank and Mishra each personally guaranteed 50% of the "credit balance of air freight, clearance and delivery charges which St. Croix Imports, Inc. incurred." (P-10). The personal guarantee signed by Tank ((P-9), hereinafter referred to as "Tank Personal Guarantee") states in full:

> RE: Personal Guarantee of Air Freight, Clearance and Delivery charges
>
> Dear Ray [Tobia]:
>
> I extend a personal guarantee for 50% of the credit balance of air freight, clearance and delivery charges St. Croix Imports, Inc. incurred from shipping approximately 60 tons of wool rugs from New Delhi, India to Minneapolis, MN. I appreciate and value our business relationship with Air Sea and look forward to a successful, long-term partnership together.

Based on the personal guarantees and the Credit Agreement, Air Sea arranged financing for the transaction through its bank. According to Tobia, the bank charged "us prime interest 4.75% plus 2.99% from the day we tap the line." (P-24). Based upon same, Air Sea arranged delivery by air through KLM around September 26, 2002. According to Air Sea, the cost was approximately $291,000 of which $251,322.85 remains unpaid[10]. The record is unclear as to the amount of rugs delivered or when they were delivered. It appears that partial deliveries were made over a period of time.

Despite this large balance owed, Tobia visited Tank and Mishra in Minneapolis in mid-

---

[10]     The prudence of the transaction is questionable. The rugs were sold to Target for $126,000, but the shipping costs alone were about $300,000. According to the testimony of Tobia. The cost of the rugs was paid separately and was also a substantial sum.

October 2002 primarily to discuss future business. At that time, Tank noted that there was "so much opportunity" with Target. (P-7). Within days of this meeting, as one may imagine, the relationship soured and friction quickly grew between Air Sea and SCI due to non-payment.  On October 30, 2002, Mishra committed to paying Tobia $30,000 per month for seven months ($210,000) to resolve the matter (P-12) because Air Sea was not releasing the rugs for delivery.  Despite the offer,  Air Sea retained an attorney to collect the amounts owed.  In November 2002, Tobia received a voicemail from Mishra and Tank cajoling Tobia to resolve the matter without a lawsuit. (P- 11).  Tank testified that he was compelled to settle because Tobia threatened to withhold delivery.  By March of 2003, while on military duty, Tank retained counsel (the Flakne Law Firm). In a letter to Air Sea's counsel, Tank's attorney Mr. Flakne acknowledged that SCI owed $202,220.00. (P-16)[11].  Because Tank was deployed at the time, he testified that he did not approve the letter.  His father or brother did so on his behalf.

Air Sea contends this lawsuit is a straightforward book account.  It offered a document entitled "Customer Open Balance" as proof of the amount owed. ((P-17), hereinafter referred to as "Open Balance Sheet"). It is attached as Appendix A.  At trial, Tobia did not offer each invoice listed on the Open Balance Sheet, but instead he selected five documents as illustrative of the charges incurred.  Tobia stated there were two types of charges. Some charges were for air freight, wire transfers and interest (P-18, 19 and 22), while others represented consulting fees (P-20 and 21).  In addition, Air Sea seeks interest in the amount of $141,046.70 from October 2002 through June 2008 (P-23), for a subtotal of $393,665.13, based upon a document entitled "Air Sea International,

---

[11]     There was other ambiguous testimony that SCI retained another freight forwarder to avert Air Sea's hold on the rugs.

Calculation of Target Amount Due."  ((P-23), hereinafter referred to as "Interest Document").  It is

attached as Appendix B.  Above that amount, Air Sea seeks 35% for collection costs ($137,782.75)

for a grand total of $531,447.88[12].

## II.

This matter comes before us as a bench trial.  Plaintiff has the burden of proving its case by

a preponderance of evidence, which means that it must prove, in light of all the evidence, that what

it claims is more likely so than not so.   3d Cir. Model Jury Instructions, *1.10, Preliminary*

*Instructions – Preponderance of the Evidence*.  With a bench trial, this Court is the sole evaluator

of the credibility of the witnesses, Tobia and Tank.  In assessing credibility, the Court employs the

same factors as a jury. They are:

> (1) the opportunity and ability of the witness to see or hear or know
> the things the witness testifies to; (2) the quality of the witness's
> understanding and memory; (3) the witness's manner while testifying;
> (4) whether the witness has an interest in the outcome of the case or
> any motive, bias or prejudice; (5) whether the witness is contradicted
> by anything the witness said or wrote before trial or by other
> evidence; (6) how reasonable the witness's testimony is when
> considered in the light of other evidence that [we] believe; and (7)
> any other factors that bear on believability."  *Id. 1.7, Preliminary*
> *Instructions – Credibility of Witnesses*.

## III.

The only issue is whether David Tank is liable, in whole or in part, for the monies owed to

Air Sea based upon the Tank Personal Guarantee because SCI is defunct and without assets.  Prior

---

[12]     Tobia noted that the first entry on the Open Balance Sheet reflects a payment of
$40,000 on September 22, 2002. All the parties agree that SCI paid that amount.  However, SCI
did so by making partial payments over time totaling $40,000. These payments were made on
October 23, 2002 ($25,000), November 6, 2002 ($10,000) and December 18, 2002 ($5,000).

to addressing Tank's liability, it is necessary to unravel some of the issues regarding the liability of the corporate entities. The evidence is clear that of all the numerous corporate entities mentioned, SCI is responsible for any reasonable amount owed to Air Sea.  The facts are undisputed:

(1)     Mishra and Tank formed SCI for the purpose of importing the carpets;

(2)     The personal guaranties of Mishra and Tank specifically state they are guaranteeing the "charges St. Croix Imports, Inc. incurred;"

(3)     There is the letter from Tank to "whom it may concern" acknowledging that Global was acting as SCI's agent in order to import the rugs (P-5); and finally

(4)     Tobia, in an e-mail to Mishra dated September 24, 2002 (P-24), demanded personal guaranties from "each of the directors, owners, [and] principals of your company."  Tobia accepted the guaranties of Tank and Mishra. The only corporate entity in which Mishra and Tank were involved was SCI.

Hence, it is clear that all parties to this litigation understood that SCI was the responsible corporate entity. Any actions by Global were to accommodate weaknesses in either SCI's financial resources or its structural deficiencies.

At trial, Tank testified otherwise.  He stated that Global was the responsible party because Mishra was a principal of Global, and Global was the entity that signed the credit application and was the company that Air Sea invoiced for the shipping charges. (*See* 2T 21:18-22).  In addition, at the time of formation of SCI, Tank contends that Mishra promised to pay for freight costs as his contribution to SCI.  Mishra disputes same, and there is no written document which corroborates Tank's contention. Finally, Tank asserted that sometime during late September/October 2002, Mishra and Tobia entered their own side agreement to import rugs, leaving SCI out. (2T 33:22-

34:11)[13].  Again there is no credible evidence but for Tank's speculation to support same. To the contrary, during this very time period, Tank signed a letter allowing Global to act as SCI's agent, as well as a personal guarantee. Hence, the testimony of Tank asserting that neither he nor SCI has any liability because it is solely a debt of Mishra's is not credible and is contrary to the weight of the evidence.

At trial, Tank also half-heartedly testified that Air Sea "didn't get the product there in time," and due to same, the Target deal imploded. (2T 55:24).  In other words, Air Sea breached, and said non-performance excuses payment of any sums to Air Sea.  This is not credible evidence. Air Sea did not cause the late delivery.  The evidence shows that SCI was ill-prepared to perform its contract with Target. SCI did not have a mechanism to finance the shipment of rugs, and it was not properly registered as an importer.  Both of these caused delays.  Moreover, SCI's own commitment to Target is the root cause of why the transaction failed. To deliver tons of rugs from India within two weeks was overly aggressive in light of issues facing SCI.  Tank's assertion that Air Sea breached its agreement is not credible.

The Court finds that Air Sea has proven by the preponderance of the evidence that Tank is liable on the Tank Personal Guarantee. There is no credible proof to the contrary. Tank acknowledged that he signed the Tank Personal Guarantee!  In addition, there is Mishra's memo acknowledging money was owed (P-12); Tank's and Mishra's taped voice mail message (P-11); and finally the Flakne law firm letter to Air Sea's attorney. (P-16). Although Air Sea has established that Tank is liable on the Tank Personal Guarantee, the amount owed is not as easily ascertained.

_____

[13]     Tank insinuated that Mishra absconded with the capital invested, and Mishra was terminated for misappropriation of funds.

IV.

Subsequent to trial, Air Sea, for the first time, seeks damages against David Tank because he fraudulently induced Air Sea into extending credit. The second amended complaint does not plead fraud; hence, Plaintiff moves pursuant to Fed. R. Civ. P. 15(b)(2) to amend the pleadings to conform to the evidence. The Plaintiff argues that Tank's testimony regarding Mishra's or Global's responsibility for the shipping bills supports a claim for fraud. That is, Tank fraudulently induced Air Sea to extend credit based on the Tank Personal Guarantee even though he had no intention of paying it, if required. The Federal Rules instruct that a court "freely permit" such amendments where "the evidence will aid in presenting the merits" and "the objecting party fails to satisfy the court that the evidence" would be prejudicial. More specifically, the Rule provides in pertinent part:

(b) Amendments During and After Trial.

(1) Based on an Objection at Trial.

If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

(2) For Issues Tried by Consent.

When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move — at any time, even after judgment — to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

In addition to this Rule, the issue implicates Fed. R. Civ. P. 9(b).  Rule 9(b) requires that fraud be pled with particularity. Allegations of fraud have a stigmatizing effect on a defendant and his reputation for integrity and honesty.  Accordingly, the rules provide the heightened pleading requirement in order to safeguard against spurious and meritless claims of fraud.  Here, Defendants had no notice of the claim of fraud until after the bench trial concluded.  Under the circumstances, it would be quite prejudicial to allow Plaintiff to pursue a claim of fraud where the defendants had no opportunity to counter the charge.  *Federal Practice and Rules*, Vol. 12B, *Civil Rules Quick Reference Guide*, p. 178 (2008).  Plaintiff instituted this suit nearly five years ago, and extensive discovery ensued.  Although Plaintiff may not have uncovered these allegations of fraud until trial, there is no reason  they were not ascertained during discovery. The motion to amend is denied because it is untimely and prejudicial to Defendants.

Second, Plaintiff's claim of fraud cannot survive because there is no factual basis. Plaintiff has not sustained its burden of proof.  In order to prove fraud, Plaintiff must prove five elements. "The five elements of common-law fraud are:  (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 691 A. 2d 350, 367 (N.J. 1997).

The facts do not support a finding of fraud.  In September 2002, Tank and Tobia, on behalf of their respective companies (SCI and Air Sea), were optimistic that the relationship with Target would be a great opportunity. As businessmen, they assumed certain risks in order to complete the rug deal and to solidify a long-term relationship with Target. At that time, Tank was committed to the venture. He invested substantial sums in SCI as evidenced by the promissory notes (D-2); he

14

executed the Tank Personal Guarantee in Air Sea's favor; and he allowed Global to act as SCI's agent in order to expedite the rug transaction.  These actions evidence Tank's intent to have SCI succeed and to pay Air Sea's invoices as Target paid its bills.  Granted Tank testified that based on his understanding of how SCI was capitalized, Mishra would be responsible for shipping costs, but from that isolated comment, one can not deduce that Tank executed the Tank Personal Guarantee in order to defraud Air Sea into advancing monies. Since Tank invested large sums into SCI from July through December 2002, he could have reasonably thought Mishra would pay the transportation costs as his contribution to SCI. Having that expectation does not mean Tank was reneging on the Tank Personal Guarantee or intentionally perpetrating fraud.  In fact, when asked that question directly, Tank emphatically stated that such an assertion was incorrect. (2T 55:13-16). The principal actors here, Mishra, Tank and Tobia, were wearing rose-colored glasses as they envisioned huge profits from their emerging relationship with Target. As a result, their expectations were unrealistic, and their commitments to each other were not properly memorialized in writing, which good lawyering and prudent business practices  require. However, the remark of Tank does not constitute a material misrepresentation of fact. The motion to amend the pleadings is denied.

A.    *Credit Agreement Versus Personal Guarantee*

Plaintiff argues that Tank's Personal Guarantee incorporates the terms of the Credit Agreement. Hence, Tank is liable to Air Sea to the same extent as SCI[14].  The Credit Agreement obligates SCI to pay all Air Sea's invoices, interest and a collection fee of 35%. (P-8).  Tank's Personal Guarantee is a highly-tailored document that "extends a personal guarantee for 50% of the

---

[14]    As discussed earlier, the Court found that Global was acting as an agent of SCI (*See* Opinion at p. 10-11).

15

credit balance of air freight, clearance and delivery charges [SCI] incurred." In other words, Plaintiff asks the Court to expansively construe the language of the Personal Guarantee beyond air freight, clearance and delivery charges. Clearly established precedent dictates otherwise. Under New Jersey law, guarantee agreements are to be strictly construed, and the language of the guarantee clause must be interpreted "most strongly" against the person at whose insistence it was written. *Connecticut General Life Ins. Co. v. Punia*, 884 F. Supp. 148, 155 (D.N.J. 1995). Similarly under Minnesota law, unless there is an ambiguity, documents connected with a guarantee speak for themselves. *General Mills, Inc. v. Wallner*, 628 F. Supp. 1573, 1574 (D. Minn. 1986). Strict construction of a guarantee is a universally accepted principle. For example, Michigan law instructs that although the Court of Appeals looks to the language of the contract, courts will not read a guarantee contract expansively. *Mazur v. Young*, 507 F.3d 1013, 1018 (6th Cir. 2007). Similarly in New York, a guarantee is to be interpreted in the strictest manner. A guarantor cannot be bound beyond the express terms of a guarantee. *United Natural Foods, Inc. v. Burgess*, 488 F. Supp. 2d 384, 394 (S.D.N.Y. 2007). With strict construction in mind, the Court must next compare the evidence to the Tank Personal Guarantee to determine the amount Tank owes, if any.

To support its claim, Plaintiff mainly relies upon two documents, the Open Balance Sheet (P-17 Appendix A) and the Interest Document (P-23 Appendix B). Each will be discussed below in the context of its relationship to the Tank Personal Guarantee.

B.    *Consultation Fees*

As previously noted, the Open Balance Sheet is a list of invoices of Air Sea regarding the shipment of the rugs (Opinion at p. 9). At trial, Plaintiff specifically referred to two invoices for consulting fees dated October 24, 2008 (P-20) in the amount of $10,252.79 and another dated

December 20, 2002 (P-21) in the amount of $23,127.25[15].   Such consulting fees are not mentioned in the Tank Personal Guarantee, and the testimony at trial in support of same was unpersuasive.

With regard to the Tank Personal Guarantee, it is limited to "air freight, clearance and delivery charges" incurred by SCI. The guarantee does not mention consulting fees. As noted above, the terms of the Tank Personal Guarantee must be strictly construed. To include consulting fees would expand the scope of the Tank Personal Guarantee beyond its clear parameters.

In addition, the Plaintiff must prove consulting fees are due by a preponderance of the evidence. *(*Opinion at p. 10). Air Sea has failed to meet this burden.  Mr. Tobia could not recall how the consulting fees were calculated.  According to Mr. Tobia, his "profit was going to be from 'consulting fees'" (1T 53:6-9). More specifically, he testified "we were doing everything at cost fronting up the money, and our agreement was that we were going to charge a consulting fee." However, his memory was hazy as to how the consulting fees were to be calculated.   Tobia acknowledged, "It was a percentage.  I don't remember the exact number." (1T 53:12-13).  Again, he honestly admitted his lack of recall. At trial, there was the following colloquy.

> THE COURT:          May I ask Mr. Tobia, are these consulting
>                     fees associated with a certain transaction?
>
> THE WITNESS:        The way it was based was on a percentage of
>                     the money we paid out. I don't remember
>                     what the exact percentage was, the number.
>
> THE COURT:          P-18. Right, that's the $63,500.
>
> THE WITNESS:        Okay.
>
> THE COURT:          Is that associated with the $10,000?

---

[15]    These amounts are entered on the Open Balance Sheet on the dates stated.

17

| THE WITNESS: | I'm not a hundred percent which invoice goes with which invoice. Normally it should be done with the same invoice number. I don't know why it wasn't done that way. I don't know which it belongs to. |
| --- | --- |
| THE COURT: | You don't know how you calculate - - |
| THE WITNESS: | I don't remember the percent we used.  I remember we agreed on the percentage. I want to say 10 percent, around there but I don't remember.  (1T 54:10-25). |

In addition to the vagueness of Tobia's testimony, Mishra testified at deposition that Air Sea's mark-up was to be between 2-5%. This is significantly less than the amount Air Sea charged. Based on the nebulous testimony of Tobia, the conflicting testimony of Mishra, and the lack of any support within the Tank Personal Guarantee, the Court finds there is inadequate evidence to allow an award for consulting fees ($33,380.04).

C.    *Bank Interest*

Air Sea seeks interest in the amount of $141,046.70 from October 2002 through June 30, 2008 based upon the Interest Document (Appendix B).  The Court is unsatisfied that the Interest Document is a trustworthy and/or relevant document for the following reasons:

1.    The lender is never identified; it is not corroborated that such a line of credit was utilized; and Tobia never testified that Air Sea actually incurred all of these interest costs.

2.    Invoices from the lender would be the best evidence of the actual interest incurred, and no such records were offered. Although the Court assumes Air Sea prepared the Interest Document, there is nothing in the record which indicates that Air Sea has any expertise in calculating interest.

18

3.     The Interest Document (Appendix B) states that $252,618.13 was owed on October 1, 2002, but if one compares the Open Balance Sheet (Appendix A) and totals all the invoices between September 26 through October 1, 2002, only $85,854.31 is owed as of that date. Hence, the opening balance on which interest is calculated is in error.

4.     According to the Interest Document, the total amount due before interest is calculated is approximately the same as the amount due on the Open Balance Sheet. However, two of the last three entries on the Open Balance Sheet ($1653.36 and $1664.38 respectively) are for "interest on line advance." Since these entries are already included within the balance due, they should not be charged again on the Interest Document.

5.     Interest is calculated on the entire amount due including consulting fees, which have been disallowed. Hence, the alleged amount of interest due is incorrect.

6.     Since the issue in the case involves David Tank's personal liability, and since the Tank Personal Guarantee does not specifically enumerate interest incurred in accordance with the terms of the line of credit as allegedly set forth in the Interest Document is not liable for such sums as enumerated in the Interest Document[16].

As such, Plaintiff has not proven by a preponderance of the evidence that Tank is obligated to pay interest as set forth in the Interest Document.

D.     *35% Collection Fee*

The Credit Agreement obligates SCI to pay a collection fee of 35%.  Tobia discussed it briefly during his testimony.  It is a percentage that reflects collection costs and legal fees.  The Tank

---

[16]     This does not mean the Court can not award prejudgment interest on another basis (Opinion at p. 22).

19

Personal Guarantee does not impose these costs upon Tank.  Generally, under the so-called "American Rule," each party pays its own costs and legal fees absent a statutory directive or an agreement that states otherwise.  *S&A Realty Corp. v. Kearny Indus. Assocs. LLP*, No. 486-05, 2007 WL 2323492, at *4 (N.J. Super. Ct. App. Div. Aug. 16, 2007).  This rule does not prevent a party from agreeing by contract to pay attorney's fees; however, such agreements will be strictly construed pursuant to the general policy disfavoring awards of attorney's fees.  *Id; McGuire v. Jersey City*, 593 A.2d 309, 317-18 (N.J. 1991).  Here, we strictly construe the relevant agreements and find that the Tank Personal Guarantee does not impose collection costs, as it explicitly guarantees air freight, clearance, and delivery charges only.  The Court will not award a collection fee pursuant to the Credit Agreement.

E.      *Amount Owed Air Sea*

Generally, one would think shipping costs would be a relatively simple number to calculate, that is, weight shipped multiplied by cost per unit of weight.  Here, the "weight unit" is in dispute.  As previously noted, the evidence is conflicting as to whether the weight of the rugs for shipping purposes was expressed in terms of kilograms or tons. *(See* Opinion at p. 5); *compare* Tobia's testimony (1T 77:1-5) *with* his e-mail to KLM (P-3).  Moreover, regardless of which (kilograms or tons) is correct, it is unclear how many such units were delivered to Target through Air Sea.  It is undisputed that Target ordered 60 tons of rugs, but Mishra, Tank and Tobia appear to testify that 47 tons or 47,000 kilograms were actually forwarded.  Air Sea did not present any document which clearly sets forth the weight of the rugs forwarded through its efforts.  Air Sea primarily relies upon the Open Balance Sheet (Appendix A) to show the amount owed; however, that document is a compilation of all the invoices, and from a review of it, the Court cannot determine the weight

shipped or the per unit cost[17].

The document which expresses Air Sea's understanding with SCI best is Tobia's email to KLM (P-3). It states that Air Sea gave "a rate of 2.912 USD per kilo" for delivery of "47,000 kilos of carpets to Minnesota from India," or $136,864. *(See* Opinion at p. 5). In addition, Mishra believed Air Sea would mark-up the amount by 2-5%. The Court deems the mark-up of 4% or $5,474.56 to be reasonable. It is obvious as well that there were other miscellaneous charges that fall within the Tank Personal Guarantee. The Court estimates these to be about $10,000-$14,000. Hence, the total fees due were about $150,000. This comports with Mishra's recollection. *See id.*

The Plaintiff submitted two documents that indicate that more than $150,000 is due. They are the memo from Mishra to Tobia indicating that $210,000 would be paid over seven months (P-12) and a letter from the Flakne Law Firm to Air Sea's attorney stating $202,000 was owed (P-16). Although these documents support Air Sea's contention that more money is due, they are not persuasive as to the amount owed pursuant to the Tank Personal Guarantee. The Mishra memo (P-12) is questionable proof of the amount owed by Tank because it is apparent that Mishra viewed Tank as a cash cow, and in his mind any amounts owed to Air Sea would be paid by Tank. Accordingly, Mishra had little interest in accurately determining the amount owed. In addition, the $210,000 is substantially higher than Mishra testified at deposition, where he recalled that the total fees due were around $150,000. The Flakne Law Firm letter (P-16) is similarly flawed. It was sent without Tank's input because he was deployed at the time. It is far from clear whether the Flakne Law Firm Letter accurately reflected Tank's position at the time.

---

[17]     The Open Balance Sheet is a summary of the amount owed. *See* Fed. R. Evid. 1006. As noted above, only several of the underlying invoices were introduced into evidence.

Since SCI made payments of $40,000 in the autumn of 2002 to Air Sea (see Opinion at p. 10 fn 12), Tank seeks a set-off of that amount from the amount due ($75,000). The liability of SCI was not at issue in this case because it is defunct. Suffice it to say, the scope of SCI's and Tank's liability are not co-terminus. Tank's liability is much narrower than SCI's due to the terms of the personal guarantee. Set-off is an affirmative defense. Tank must prove he is entitled to a set-off by a preponderance of the evidence. In Tank's testimony, he did not specify, and there is no document which indicates that the $40,000 was solely in payment of air freight, clearance and delivery charges as stated in the Tank Personal Guarantee. Hence, Air Sea could have reasonably allocated the $40,000 to consulting fees and interest owed by SCI under either the credit agreement or the letter of credit. Tank has not proven by a preponderance of the evidence that he is entitled to a set-off[18].

In a previous section, this Court rejected the calculation of interest as provided in the Interest Document. Notwithstanding same, the Court finds an independent statutory reason for such an award. Whether to award prejudgment interest in contracts cases is left to the discretion of trial courts. *See AGS Computers, Inc. v. Bear, Stearns & Co., Inc.*, 581 A.2d 508, 509 (N.J. Super. Ct. App. Div. 1990). In New Jersey, prejudgment interest runs not as a matter of right, but rather, in accordance with equitable principles. *Meier v. New Jersey Life Ins. Co.*, 503 A.2d 862, 875 (N.J. 1986). In the matter at hand, the Court will award interest, as "the purpose of awarding prejudgment interest is to compensate the claimant for the loss of income the money owed would have earned if payment had not been delayed." *Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 642 (D.N.J. 1998). As one case stated, "in awarding prejudgment interest, [t]he basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor

---

[18]     As noted earlier, many aspects of Tank's testimony lacked candor.

simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled." *County of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 608 (N.J. 2006)  Air Sea has lost substantial income as a result of not being paid for services rendered in late 2002 and is entitled to prejudgment interest.

Interest is also discussed in the Credit Agreement, wherein Mishra and Air Sea agreed that interest would be due "at the current maximum, legally allowed rate in the applicable state."  I will not hold Tank responsible to pay this maximum allowable interest agreed to by Mishra.  Often federal courts use 28 U.S.C. § 1961 (2000) as a guide in calculating prejudgment interest.  *See, e.g., Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128, 137 (D.N.J. 2007); *McCoy v. Board of Trustees of Laborers' Intern. Union Local No. 222 Pension Plan*, 188 F. Supp. 2d 461, 471 n.7 (D.N.J. 2002).  This statute provides that interest shall be calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." In this instance, that interest rate is artificially low due to the recent financial crisis.  As a result, the Court has substituted a different interest rate as set forth in Appendix C.  We will not compound prejudgment interest, as "New Jersey state courts have found that it unduly hastens the accumulation of debt and regard it as unfairly harsh and oppressive."  *Phibro Animal Health U.S., Inc. v. Cornerstone AG Products*, No. 03-cv-2664, 2006 WL 3733022, at *2 (D.N.J. Dec. 18, 2006), aff'd 271 Fed. Appx. 214 (3d Cir. 2008) (quotations omitted).  The interest has accrued from the date that delivery of the rugs was made, which was approximately October 1, 2002 through the date of this judgment (November 14, 2008).

23

Accordingly, the Court finds Tank is liable for one-half of $150,000 or $75,000 plus prejudgment interest in the amount of $13,845.84.

Judgment in favor of plaintiff in the amount of $88,845.84 plus costs is entered.

*s/Peter G. Sheridan*

November 14, 2008                              PETER G. SHERIDAN, U.S.D.J.

# A INTERNATIONAL FORWARDING, INC.

## Customer Open Balance

### All Transactions



APPENDIX A

| Type | Date | Num | Memo | Date | Balance | Amount |
|------|------|-----|------|------|---------|--------|
| voice | 09/26/2002 | 12539-01-1 | 074-53390083 REF No:12539-01 B/L:074-533900 | 09/26/2002 | 9,955.34 | 48,955.34 |
| voice | 09/29/2002 | 12524-01-1 | 020-23902274 REF No:12524-01 B/L:020-239322 | 09/26/2002 | 63,850.99 | 63,850.99 |
| voice | 09/27/2002 | 12539-01-2 | 074-53390083 REF No:12539-01 B/L:074-533900 | 09/30/2002 | 605.13 | 605.13 |
| voice | 09/27/2002 | 12539-01-3 | 074-53390083 REF No:12539-01 B/L:074-533900 | 09/30/2002 | 1,201.16 | 1,201.16 |
| voice | 09/30/2002 | 12539-01-4 | 074-53390083 REF No:12539-01 B/L:074-533900 | 09/30/2002 | 286.35 | 285.35 |
| voice | 10/01/2002 | 12525-01-1 | 057-23548213 REF No:12525-01 B/L:057-235482 | 10/01/2002 | 9,187.40 | 9,187.40 |
| voice | 10/03/2002 | 12524-01-2 | 020-23932274 REF No:12524-01 B/L:020-239322 | 10/03/2002 | 1,133.54 | 1,133.54 |
| voice | 10/03/2002 | 12524-01-3 | REF No:12524-01 B/L:020-23932274 BKG: | 10/03/2002 | 820.65 | 820.65 |
| voice | 10/03/2002 | 12525-01-2 | 057-23548213 REF No:12525-01 B/L:057-235482 | 10/03/2002 | 640.73 | 640.73 |
| voice | 10/04/2002 | 12551-01-1 | 074-53390142 REF No:12551-01 B/L:074-533901 | 10/07/2002 | 26,167.93 | 26,167.93 |
| voice | 10/04/2002 | 12575-01-1 | 020-23932366 REF No:12575-01 B/L:020-239323 | 10/07/2002 | 37,715.23 | 37,715.20 |
| voice | 10/04/2002 | 12576-01-1 | 057-23548224 REF No:12576-01 B/L:057-235482 | 10/07/2002 | 10,271.40 | 10,271.40 |
| voice | 10/07/2002 | 12551-01-2 | 074-53390142 REF No:12551-01 B/L:074-533901 | 10/07/2002 | 209.68 | 209.68 |
| voice | 10/07/2002 | 12551-01-3 | 074-53390142 REF No:12551-01 B/L:074-533901 | 10/07/2002 | 708.55 | 708.55 |
| voice | 10/07/2002 | 12575-01-2 | 020-23932366 REF No:12575-01 B/L:020-239323 | 10/07/2002 | 896.60 | 896.60 |
| voice | 10/07/2002 | 12576-01-2 | 057-23548224 REF No:12576-01 B/L:057-235482 | 10/07/2002 | 258.86 | 258.86 |
| voice | 10/07/2002 | 12576-01-3 | 057-23548224 REF No:12576-01 B/L:057-235482 | 10/07/2002 | 856.90 | 856.90 |
| voice | 10/17/2002 | 12524-01-4 | 020-23932274 REF No:12524-01 B/L:020-239322 | 10/17/2002 | 177.43 | 177.43 |
| voice | 10/17/2002 | 12525-01-3 | 057-23548213 REF No:12525-01 B/L:057-235482 | 10/17/2002 | 13.92 | 13.92 |
| voice | 10/17/2002 | 12539-01-5 | 074-53390083 REF No:12539-01 B/L:074-533900 | 10/17/2002 | 162.14 | 162.14 |
| voice | 10/17/2002 | 12551-01-4 | 074-53390142 REF No:12551-01 B/L:074-533901 | 10/17/2002 | 26.44 | 26.44 |
| voice | 10/17/2002 | 12575-01-3 | 020-23932366 REF No:12575-01 B/L:020-239323 | 10/17/2002 | 38.06 | 38.06 |
| voice | 10/17/2002 | 12576-01-4 | 057-23548224 REF No:12576-01 B/L:057-235482 | 10/17/2002 | 10.36 | 10.36 |
| voice | 10/24/2002 | 12524-01-5 | 020-23932274 REF No:12524-01 B/L:020-239322 | 10/24/2002 | 145.17 | 145.17 |
| voice | 10/24/2002 | 12525-01-4 | 057-23548213 REF No:12525-01 B/L:057-235482 | 10/24/2002 | 20.68 | 20.68 |
| voice | 10/24/2002 | 12539-01-6 | 074-53390083 REF No:12539-01 B/L:074-533900 | 10/24/2002 | 132.66 | 132.66 |
| voice | 10/24/2002 | 12551-01-5 | 074-53390142 REF No:12551-01 B/L:074-533901 | 10/24/2002 | 59.49 | 59.49 |
| voice | 10/24/2002 | 12575-01-4 | 020-23932366 REF No:12575-01 B/L:020-239323 | 10/24/2002 | 85.68 | 65.68 |
| voice | 10/24/2002 | 12576-01-5 | 057-23548224 REF No:12576-01 B/L:057-235482 | 10/24/2002 | 23.31 | 23.31 |
| voice | 10/24/2002 | 12677-1 | 000-REF No:12677 B/L:000-BKG: | 10/24/2002 | 10,252.76 | 10,252.76 |
| voice | 10/30/2002 | 12665-01-1 | 074-55069816 REF No:12665-01 B/L:074-550598 | 10/30/2002 | 6,328.41 | 6,328.41 |
| voice | 11/05/2002 | 12665-01-2 | 074-55069816 REF No:12665-01 B/L:074-550598 | 11/05/2002 | 773.45 | 773.45 |
| voice | 11/05/2002 | 12665-01-3 | 074-55069816 REF No:12665-01 B/L:074-550598 | 11/05/2002 | 210.34 | 210.34 |
| voice | 11/13/2002 | 12735-01-1 | 074-55069828 REF No:12735-01 B/L:074-550598 | 11/13/2002 | 18,108.90 | 18,108.90 |
| voice | 11/13/2002 | 12735-01-2 | 074-55069828 REF No:12735-01 B/L:074-550598 | 11/13/2002 | 665.62 | 665.62 |
| voice | 11/15/2002 | 12524-01-6 | 020-23932274 REF No:12524-01 B/L:020-239322 | 11/15/2002 | 483.90 | 483.90 |
| voice | 11/15/2002 | 12525-01-5 | 057-23548213 REF No:12525-01 B/L:057-235482 | 11/15/2002 | 69.60 | 69.60 |
| voice | 11/15/2002 | 12539-01-7 | 074-53390083 REF No:12539-01 B/L:074-533900 | 11/15/2002 | 442.20 | 442.20 |
| voice | 11/15/2002 | 12551-01-6 | 074-53390142 REF No:12551-01 B/L:074-533901 | 11/15/2002 | 108.30 | 108.30 |
| voice | 11/15/2002 | 12575-01-5 | 020-23932366 REF No:12575-01 B/L:020-239323 | 11/15/2002 | 285.60 | 285.80 |
| voice | 11/15/2002 | 12576-01-6 | 057-23548224 REF No:12576-01 B/L:057-235482 | 11/15/2002 | 77.70 | 77.70 |
| voice | 11/15/2002 | 12665-01-4 | 074-55069815 REF No:12665-01 B/L:074-550598 | 11/15/2002 | 57.10 | 57.10 |
| voice | 11/15/2002 | 12677-2 | 000-REF No:12677 B/L:000-BKG: | 11/15/2002 | 95.20 | 95.20 |
| voice | 11/15/2002 | 12727-01-1 | 074-55069922 REF No:12727-01 B/L:074-550599 | 11/15/2002 | 14,845.95 | 14,845.95 |
| voice | 11/15/2002 | 12735-01-3 | 074-55069826 REF No:12735-01 B/L:074-550598 | 11/15/2002 | 137.10 | 137.10 |
| voice | 11/15/2002 | 12727-01-2 | 074-55069922 REF No:12727-01 B/L:074-550599 | 11/15/2002 | 631.48 | 631.48 |
| voice | 11/15/2002 | 12727-01-3 | 074-55069922 REF No:12727-01 B/L:074-550599 | 11/15/2002 | 279.67 | 279.67 |
| Type |  | Num |  | Date |  |  |
| voice | 12/02/2002 | 12858-01-1 | REF No:12858-01 B/L:074-55072242 BKG: | 12/02/2002 | 565.79 | 565.79 |
| voice | 12/02/2002 | 12857-01-1 | REF No:12857-01 B/L:074-55072301 BKG: | 12/02/2002 | 581.67 | 581.67 |
| voice | 12/02/2002 | 12854-01-1 | REF No:12854-01 B/L:074-55072242 BKG: | 12/02/2002 | 525.00 | 525.00 |
| voice | 12/04/2002 | 12524-01-7 | 020-23932274 REF No:12524-01 B/L:020-239322 | 12/04/2002 | 500.03 | 500.03 |
| voice | 12/04/2002 | 12525-01-6 | 057-23548213 REF No:12525-01 B/L:057-235482 | 12/04/2002 | 71.92 | 71.92 |
| voice | 12/04/2002 | 12539-01-8 | 074-53390083 REF No:12539-01 B/L:074-533900 | 12/04/2002 | 456.94 | 456.94 |
| voice | 12/04/2002 | 12551-01-7 | 074-53390142 REF No:12551-01 B/L:074-533901 | 12/04/2002 | 204.91 | 204.91 |
| voice | 12/04/2002 | 12575-01-6 | 020-23932366 REF No:12575-01 B/L:020-239323 | 12/04/2002 | 295.12 | 295.12 |
| voice | 12/04/2002 | 12576-01-7 | 057-23548224 REF No:12576-01 B/L:057-235482 | 12/04/2002 | 80.29 | 80.29 |
| voice | 12/04/2002 | 12665-01-5 | 074-55069815 REF No:12665-01 B/L:074-550598 | 12/04/2002 | 49.29 | 49.29 |
| voice | 12/04/2002 | 12677-3 | 000-REF No:12677 B/L:000-BKG: | 12/04/2002 | 80.60 | 80.60 |
| voice | 12/04/2002 | 12727-01-4 | 074-55069922 REF No:12727-01 B/L:074-550599 | 12/04/2002 | 116.56 | 116.56 |
| voice | 12/04/2002 | 12735-01-4 | 074-55069826 REF No:12735-01 B/L:074-550598 | 12/04/2002 | 141.67 | 141.67 |
| voice | 12/09/2002 | 12897-1 | REF No:12897 BAL:BKG: | 12/04/2002 | 23,127.25 | 23,127.25 |
| voice | 12/23/2002 |  |  | 12/23/2002 | 1,250.00 | 1,250.00 |
| voice | 01/01/2003 | 01-01-03 | INTEREST ON LINE ADVANCE | 01/01/2003 | 1,653.38 | 1,653.38 |
| voice | 01/15/2003 | COLLFEE |  | 01/15/2003 | 500.00 | 500.00 |
| voice | 02/01/2003 | 02-01-03 | INTEREST ON LINE ADVANCE | 02/01/2003 | 1,664.38 | 1,664.38 |
|  |  |  |  |  | 291,322.66 | 291,322.66 |
|  |  |  |  |  | 291,322.66 | 291,322.66 |

Air Sea International

Principal Amount as of October 1, 2002    $252,618.33

EXHIBIT

2-23

APPENDIX B

| Date | Monthly Interest | Principal & Interest Due |
|------|------------------|--------------------------|
| 31-Oct-02 | $1,629.39 | $254,247.72 |
| 30-Nov-02 | $1,639.90 | $255,887.62 |
| 31-Dec-02 | $1,650.48 | $257,538.09 |
| 31-Jan-03 | $1,661.12 | $259,199.21 |
| 28-Feb-03 | $1,671.83 | $260,871.05 |
| 31-Mar-03 | $1,682.62 | $262,553.66 |
| 30-Apr-03 | $1,693.47 | $264,247.14 |
| 31-May-03 | $1,704.39 | $265,951.53 |
| 30-Jun-03 | $1,715.39 | $267,666.92 |
| 31-Jul-03 | $1,726.45 | $269,393.37 |
| 31-Aug-03 | $1,737.59 | $271,130.96 |
| 30-Sep-03 | $1,748.79 | $272,879.75 |
| 31-Oct-03 | $1,760.07 | $274,639.83 |
| 30-Nov-03 | $1,771.43 | $276,411.25 |
| 31-Dec-03 | $1,782.85 | $278,194.10 |
| 31-Jan-04 | $1,794.35 | $279,988.46 |
| 28-Feb-04 | $1,805.93 | $281,794.38 |
| 31-Mar-04 | $1,817.57 | $283,611.96 |
| 30-Apr-04 | $1,829.30 | $285,441.25 |
| 31-May-04 | $1,841.10 | $287,282.35 |
| 30-Jun-04 | $1,852.97 | $289,135.32 |
| 31-Jul-04 | $1,864.92 | $291,000.24 |
| 31-Aug-04 | $1,876.95 | $292,877.19 |
| 30-Sep-04 | $1,889.06 | $294,766.25 |
| 31-Oct-04 | $1,901.24 | $296,667.50 |
| 30-Nov-04 | $1,913.51 | $298,581.00 |
| 31-Dec-04 | $1,925.85 | $300,506.85 |
| 31-Jan-05 | $1,938.27 | $302,445.12 |
| 28-Feb-05 | $1,950.77 | $304,395.89 |
| 31-Mar-05 | $1,963.35 | $306,359.24 |
| 30-Apr-05 | $1,976.02 | $308,335.26 |
| 31-May-05 | $1,988.76 | $310,324.02 |
| 30-Jun-05 | $2,001.59 | $312,325.61 |
| 31-Jul-05 | $2,014.50 | $314,340.11 |
| 31-Aug-05 | $2,027.49 | $316,367.60 |
| 30-Sep-05 | $2,040.57 | $318,408.18 |
| 31-Oct-05 | $2,053.73 | $320,461.91 |
| 30-Nov-05 | $2,066.98 | $322,528.89 |
| 31-Dec-05 | $2,080.31 | $324,609.20 |
| 31-Jan-06 | $2,093.73 | $326,702.93 |
| 28-Feb-06 | $2,107.23 | $328,810.16 |
| 31-Mar-06 | $2,120.83 | $330,930.99 |
| 30-Apr-06 | $2,134.50 | $333,065.49 |
| 31-May-06 | $2,148.27 | $335,213.77 |
| 30-Jun-06 | $2,162.13 | $337,375.89 |
| 31-Jul-06 | $2,176.07 | $339,551.97 |
| 31-Aug-06 | $2,190.11 | $341,742.08 |
| 30-Sep-06 | $2,204.24 | $343,946.32 |
| 31-Oct-06 | $2,218.45 | $346,164.77 |
| 30-Nov-06 | $2,232.76 | $348,397.53 |
| 31-Dec-06 | $2,247.16 | $350,644.70 |
| 31-Jan-07 | $2,261.66 | $352,906.35 |
| 28-Feb-07 | $2,276.25 | $355,182.60 |
| 31-Mar-07 | $2,290.93 | $357,473.53 |
| 30-Apr-07 | $2,305.70 | $359,779.23 |
| 31-May-07 | $2,320.58 | $362,099.81 |
| 30-Jun-07 | $2,335.54 | $364,435.35 |
| 31-Jul-07 | $2,350.61 | $366,785.96 |
| 31-Aug-07 | $2,365.77 | $369,151.73 |
| 30-Sep-07 | $2,381.03 | $371,532.76 |
| 31-Oct-07 | $2,396.39 | $373,929.14 |
| 30-Nov-07 | $2,411.84 | $376,340.99 |
| 31-Dec-07 | $2,427.40 | $378,768.39 |
| 31-Jan-08 | $2,443.06 | $381,211.44 |
| 28-Feb-08 | $2,458.81 | $383,670.26 |
| 31-Mar-08 | $2,474.67 | $386,144.93 |
| 30-Apr-08 | $2,490.63 | $388,635.56 |
| 31-May-08 | $2,506.70 | $391,142.26 |
| 30-Jun-08 | $2,522.87 | $393,665.13 |

APPENDIX C

The Annual Market Yield on U.S. Treasury Securities at 1-year Constant Maturity was used to calculate interest from October 1, 2002 through November 14, 2008.

| | | |
|---|---|---|
| Year Ending October 2003 | 1.24%[1] | $937.50 |
| Year Ending October 2004 | 1.89% | $1,417.50 |
| Year Ending October 2005 | 3.62% | $2,715.00 |
| Year Ending October 2006 | 4.94% | $3,705.00 |
| Year Ending October 2007 | 4.53% | $3,397.50 |
| Year Ending October 2008 | 2.00% approx. | $1,500.00 |
| October 1 - November 14, 2008 | 2.00% approx. | $173.84 |
| | Total | $13,845.84 |

---

[1]     (http://www.federalreserve.gov)